INTHE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GROUPCHATTER, LLC,

       Plaintiff,

v.

TELEGRAM MESSENGER, LLP, and
TELEGRAM LLC

       Defendants.

CIVIL ACTION FILE

NO._____

## COMPLAINT AND JURY DEMAND

1.    Plaintiff GroupChatter, LLC files this Complaint against Defendants Telegram Messenger, LLP, and Telegram LLC (each a "Defendant" and collectively "Defendants" or "Telegram") for infringement of U.S. Patent Nos. 8,588,207; 9,014,659; and 9,294,888.

### THE PARTIES

2.    Plaintiff GroupChatter, LLC ("GroupChatter") is a Texas limited liability company with its headquarters and principal place of business at 1400 Preston Road, Suite 475, Plano, Texas 75093.

3.    Defendant Telegram Messenger, LLP, is a Limited Liability Partnership organized and existing under the laws of England and Wales and may be served at its principal place of business at 71-75 Shelton Street,

Covent Garden, London WC2H 9JQ, England, pursuant to Fed. R. Civ. P. 4(f) and the Hague Convention.

4.    Defendant Telegram LLC is a Delaware corporation that may be served through its registered agent, A Registered Agent, Inc., at 8 The Green, Suite A, Dover, Delaware, 19901.

## JURISDICTION AND VENUE

5.    GroupChatter brings this action for patent infringement under the patent laws of the United States, namely 35 U.S.C. §§ 271, 281, and 284-285, among others.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367.

6.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c) and 1400(b).  Defendants do business in this judicial district, have provided downloads of the Telegram application to users in this district, committed acts of infringement in this judicial district, and have purposely transacted business in this judicial district involving the accused products.

7.    Defendants are subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the Georgia Long-Arm Statute, due at least to their substantial business in this State and judicial district, including (A) at least part of its infringing activities alleged herein; and (B) regularly doing or

soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from goods sold and services provided to Georgia residents.

## GROUPCHATTER PATENTS

8.     Telegram has infringed and continues to infringe U.S. Patent Nos. 8,588,207 (the "'207 Patent"); 9,014,659 (the "'659 Patent"), and 9,294,888 (the "'888 Patent") (collectively the "Asserted Patents").

9.     The '659, '207, and '888 Patents relate to methods, apparatuses, and systems for providing acknowledged, deterministic mass messaging over a two-way wireless network.

### GroupChatter '659, '207, and '888 Patents

10.     The GroupChatter Asserted '659, '207, and '888 Patents describe a two-way communication system and method providing acknowledged responses to group messages to enable deterministic group messaging within the claimed network architecture and addressing scheme.

11.     "Deterministic" group messaging refers to one of the advantages delivered by the inventions.  Using the claimed system offers the potential benefit of providing timely updates for and from endpoints within a group.  In operation, these endpoints (e.g., smartphones, pagers, utility meters, transponders, etc.) send responses to group messages and thereby provide data from which to determine the

status of each endpoint.

12.    Broadly speaking, GroupChatter accuses Telegram of infringement for providing, operating, testing, and using its Telegram ecosystem (e.g., infrastructure and software) that allows its users to conduct and participate in group messaging (e.g., deterministic, acknowledged, and within a social network) as recited in the Asserted Claims.

13.    The inventors noted in the patent specification that certain communication networks, even those with endpoint devices capable of acknowledging group messages, failed to provide the valuable advantage of deterministic communication because they provided no way to maintain the status of each group member.  This left administrators lacking important data about the status of each group member.

14.    To solve this problem and other shortcomings of prior two-way wireless messaging networks, the inventors conceived a novel combination for maintaining group management information and organization for use on a wireless network.  They describe in the Asserted Patents how to build and deploy the network architecture to use it and achieve these benefits.

15.    In the Asserted Claims of the '659, '207, and '888 Patents, endpoints are identified by information about the user or specific endpoint device and by

groups that particular recipient belongs to.  In addition to the two-way wireless architecture of the radio network, a client/server-based architecture is provided for communication between a network client and the two-way wireless network.

16.    Through client/server interactions, a user is provided up-to-date group information that may include address information, status information pertaining to a message or response, overall group detail and status, or even specific information about endpoints within a group.

17.    In operation, Telegram stores recipient identifiers, one or more group identifiers for each recipient endpoint, and group membership data that identifies which recipients belong to specific groups.  An endpoint may belong to multiple groups and thus may be associated with multiple group identifiers.

18.    A Telegram group message is initiated via a network client and wirelessly transmitted to endpoint devices located anywhere within the range of the wireless network infrastructure.  Endpoints are configured to receive group messages and respond with status information, alphanumeric text entries, or other information based upon the message and endpoint device status.

19.    Efficient group management and maintenance is an advantage of the claimed system and is demonstrated in operation of the claimed invention by reference to and communication with selected endpoints and groups of endpoints

that each have a subset of the group information data stored locally.

20.    FIG. 1 of the '207 Patent (reproduced below) depicts at a high-level aspects of an embodied network related to one or more claims:



FIG. 1

21.    As shown, exemplary structural elements for an embodied system include: (1) a network client 20; (2) a network switch or server 12 coupled to a receiver database 18; (3) a wireless network 14; and (4) a plurality of mobile receivers 16 (e.g., smartphones, meters, etc.).

22.    As background, the inventors conceived the subject matter of the patents-in-suit in part to address issues in communication networks of the day.  For example, some radios and associated wireless networks used by emergency

responders were unable to handle the heavy network traffic that circumstances unfortunately required.  '207 Patent, col. 1; lines 40-49.  The "Background of the Invention" states:

> "during the events of Sep. 11, 2001, radio channels became oversaturated, and interoperability problems among jurisdictions and agencies persisted throughout the entire response process. Otherwise compatible portable radios were preprogrammed in a manner that precluded interoperability. Cellular telephone systems and even the public switched telephone network (PSTN) became congested and unusable."

23.    During the September 11 tragedy, older pager systems proved more reliable than cell phone networks.  But while pager-based systems had the potential to be relatively robust in emergency circumstances, such systems of the time were unable to efficiently process group messages (i.e., messages to groups of recipients) and track the individual responses to know which members of the group had responded.   The Background of the Invention section of the specification states:

> "none of these systems provide a network interface sufficient to support acknowledged group messaging. Requiring that the message originator individually alert each recipient adds considerable setup delay when alerting large groups."

24.    Accordingly, the inventors conceived the invention(s) to address these problems.  The result was a novel system that efficiently used limited bandwidth

and network resources to effectively communicate with selected endpoints groups whose membership may be dynamically created and adjusted. Even in these conditions, the inventors sought to provide effective group management and improved network efficiency, operability, and reliability (based on the challenges of the time).

25.    The Asserted '659, '207, and '888 Patents require, among other things, a specific network architecture that may include at least: wireless network (e.g., a cellular network) infrastructure (e.g., base stations, backhaul, transmitters, receivers, antennae, Telegram servers, and central switch), and multiple network clients (e.g., smartphones running Telegram and equipped with two-way wireless communication modules for communicating on the wireless network).

26.    The subject matter of the system and method claims asserted against Defendant are tied to the structural deployment described in the Asserted Patents and address shortcomings in group management and communication that the inventors experienced before their invention.

27.    In operation, the Asserted Claims detail how a message originator, who may lack knowledge of specific details regarding a particular endpoint group, is provided group information to the network client. Such information may include membership information for each group, the number of recipient endpoints sharing

a group identifier, or an identifier shared by certain recipient endpoints within a group.

28.    The claims recite a specific method for providing this information. The Asserted Claims of the '659, '207, and '888 Patents describe and recite the source of group and recipient endpoint information, how and when it is transmitted to a network client, and how it may be displayed and updated at the network client.

29.    In an example scenario where an incident commander is seeking assistance over a pager network, a notification feature can provide the commander (i.e., the message originator) details about the number, identities, and statuses of group members.  Using the invention for this feature, the commander is able to determine based upon the group messaging system information, a status of group members.  Without this feature, an incident commander may have insufficient context to know whether enough personnel was being summoned, or whether key individuals had been mobilized.[1]

30.    By using the claimed addressing scheme described in the Asserted Patents, Defendant and other infringers are able to communicate to ad hoc or dynamically organized groups of users.

31.    Additional meaningful claim elements in the Asserted Claims include:

---

[1] *See* '207 Patent: col. 2, lines 22-26.

(1) providing recipient identifier and group identifier information for each group to which a recipient is a member; and (2) storing acknowledgement data for each group member that lists them and indicates their response (e.g., "…*storing acknowledgement data in the memory device for each of the group members, the acknowledgement data comprising a listing of each of the group members and an indication of response for each of the group members*").  In previous systems, referring again to the incident commander's scenario for example, after a volunteer group was alerted by pager, the incident commander would not know who was going to respond until personnel began to arrive on scene.  In contrast, with the claimed "deterministic" group messaging systems, incident commanders (or group administrators) are updated in response to the group messages dispatched. Responses are linked to endpoint recipients within the group context, an advantage and novel advancement achieved by the inventive group management scheme.  In this way, the inventive systems and methods provide a valuable concrete result: deterministic status information provided to a network client device for groups of endpoint recipients across a two-way wireless communication network.

32.    Accordingly, the Asserted Claims of the '659, '207, and '888 Patents are directed to a specific two-way wireless architecture appended with a group management and maintenance system based upon group and recipient identifiers

for identifying with and selectively communicating with endpoint recipients across the network.

33.    Acknowledged group messaging may be performed in ways and across architectures that differ from the claimed subject matter.   While the advantages of the inventions likely will not be achieved, two-way messaging with selective groups of endpoints and management of such groups may be performed using other methods such as frequency division across the geographical region or focused transmission, encryption, or having multiple radios in the network infrastructure for communicating with predetermined groups based upon location.

34.    The Asserted Claims provide structure and limit the invention to particular and novel ways of deterministically messaging selective groups of recipients on a two-way wireless communication network.   These structural limitations describing architecture, integrated computer-based operations necessary to practice the patent claims (e.g., database tables, communication at network client with server/switch), wireless network protocol capable of communicating with groups, and endpoints that can receive and interpret those signals provide meaningful structural limitations that one of skill in the art would recognize as distinctions between network types.

35.    The operations, function, and results of the subject matter of the

Accused System cannot be carried out and achieved by a human or generic computer or by using a generic two-way wireless radio network.

36.    Generic computer networks or wireless two-way radio networks do not perform "group communication and response tracking" or "group management and maintenance" as those general concepts are claimed in the Asserted Patents.

37.    Some of the major advantages of the claimed systems and advances over the prior art are discussed in the specification (centralized management and administration of groups and recipients' relationships with groups, effectively communicating with multiple endpoints in groups, and tracking status across a network by group).  One skilled in the art at the time of the inventions would further recognize additional advantages including management of groups across a dispersed area or networks, tracking status information of recipient groups including whether individual group members have received or read a group message, and monitoring this information at a dispatch center.

38.    By the novel combination of its two-way wireless network architecture, group management and maintenance scheme, and deterministic messaging functionality, the Asserted Patents present a specific, inventive solution to the problem the inventors recognized with messaging networks at the time of their invention.

## TELEGRAM

39.    Telegram is an Internet-based messaging service accessible through multiple platforms including Android, iOS, Windows Phone, Ubuntu Touch, Windows, MacOS, and Linux.

40.    Telegram is a unified cloud service.  Telegram can be compared to SMS and email combined, where a user can take care of all of the user's personal or business messaging needs.

41.    Telegram transmits messages to recipients over a wireless network (e.g., cellular or Wi-Fi).

42.    Telegram users exchange messages with other Telegram users. Messages may include text, stickers, photographs, videos, audio clips, and other files (e.g., doc, zip, mp3, etc.).

43.    Telegram users exchange stickers, which are an expressive form of emoji.  Telegram offers multiple stickers for one emoji (e.g., a smiling face).

44.    Telegram accounts are tied to a mobile telephone number.  Telegram is a "cross-platform" communication system, and users can add multiple devices to their accounts.  Telegram's messages are, by default, cloud-based and can be accessed on any of the user's devices.

45.    Telegram includes channels for broadcasting messages to multiple

subscribers at once.  Users can join a channel and see a message history.

46.    Telegram uses various software clients including Telegram (separately for MacOS, Android 2.3 or later, Firefox OS, Google Chrome, and Chrome OS), Telegram Messenger (separately for iOS 6 or later and Windows Phone), and Telegram Desktop.  Telegram further operates using Cutegram, Telegram CLI, Telegram for Ubuntu Touch, Sailorgram, and Telegram-Purple.

47.    Defendants independently and/or collectively provide the Telegram ecosystem, which enables users to communicate seamlessly across mobile phones, tablets, and computers regardless of each device's operating system.

48.    Telegram users download and install the Telegram software and may install a copy of the software on each of their devices.

49.    Once installed, Telegram software accesses a user's contacts and provides a notification to the user identifying the user's contacts that also use Telegram.

50.    Telegram enables users to set up and view a personal list of contacts. Each time the Telegram app is launched, contacts on the Telegram servers are synced with the user's local address book.  Contacts with Telegram accounts are shown first in a list, followed by the rest of the contacts on the user device.

51.    Tapping a Telegram contact opens a chat with the user.

52.    Tapping an unregistered contact opens an invitation dialog on the standard SMS screen.

53.    Telegram users chat using written "conversations."

54.    Telegram permits users to call each other with voice calls.

55.    Telegram users can send and receive secret chats.  All messages in secret chats use end-to-end encryption.

56.    Telegram messages are heavily encrypted and can self-destruct.

57.    Telegram stores user messages in the cloud.

58.    Telegram users can coordinate groups of up to 200 members and supergroups of up to 5000 members.

59.    Telegram group chat is a method for alerting and communicating with a group of recipients over a wireless network.

60.    In iOS, Telegram users create a group by starting a new message (e.g., tapping an icon in the top right corner in Chats) then tapping "New Group."

61.    In Android, Telegram users create a group by tapping the circular pencil icon.

62.    In Windows Phone, Telegram users create a group by tapping the "+" button on the bottom bar then tapping "New Group."

63.    Telegram apps store data comprising recipient identifiers (e.g.,

username) and group identifiers (e.g., group name) corresponding to groups of selected recipients.

64.    Telegram users can set up a public username and it becomes possible for other users to find that user by that username.  The user will appear in contacts searches under "global results."

65.    Telegram users are not required to have a public username because Telegram usernames are public.  Accordingly, choosing a username on Telegram makes it possible for people to find a user in a global search and send that user messages even if they do not have that user's number.

66.    A user can set up a username in Settings and use the universal search box in the chats list to search for chats, messages, and usernames.

67.    Telegram notifies users in real-time how many members belong to a group and how many group members are online.

68.    Telegram enabled mobile devices, upon receiving a message, update the sender's display to indicate if a message has been received or read.

69.    If a message is delivered to the Telegram cloud and a friend has been notified, Telegram notifies the user with one check next to an outbound message.

70.    If a message is read by the user's friend (e.g., the friend opened Telegram and opened the conversation with the message), Telegram notifies the

user with two checks next to an outbound message.

71.    Telegram runs on multiple devices and therefore does not specifically provide a "delivered to device" status for messages.

72.    Telegram provides internal notifications (e.g., "John is typing...") if a user is currently inside the app but is not viewing a chat in which a new message was sent.

73.    Telegram servers store acknowledgment information for each message on a recipient-by-recipient basis.  Telegram's web interface displays an "unread messages banner" which may be different for each recipient depending on whether that recipient has seen certain messages.

74.    A group chat info page allows Telegram users to edit the title, photograph, notification settings, and a member list of a group.

75.    The Telegram app employs a method for socially networking a plurality of users of mobile terminals (e.g., smartphones, tablets, and laptops).

76.    The Telegram app allows a user to setup and view a personal list of contacts.

77.    For the list of contacts, the Telegram app includes status information including "last seen at [time]" or "online."

78.    The Telegram app allows a user to establish communications (e.g.,

message) with contacts.

79.    The Telegram app allows a user to view posted content (e.g., messages) of contacts.

80.    The Telegram application displays a pop-up notification when a contact publishes new content.

81.    The Telegram website allows a user to respond to the new content that appeared in a pop-up notification, for example with a thumbs up emoji, crying emoji, heart emoji, smiling emoji, and so forth.

82.    To communicate using the Telegram ecosystem, Telegram users must use the Telegram software (i.e., apps) provided by Defendants.

83.    Telegram software is available at www.telegram.org (via web browser) and from app stores operated by Apple, Google, and Microsoft.

84.    The Telegram software is available for various hardware including Apple devices (e.g., iPods, iPhones, and iPads running each iOS version), Android-based devices (e.g., Android wear devices, cell phones, tablets, and computers running each Android version), Microsoft Windows-based devices (e.g., cell phones, tablets, and computers running each Windows version), and Linux-based devices.

85.    According to Defendants, Telegram is currently available for the

following systems, as examples:

> You can use Telegram on smartphones, tablets, and even computers. We have apps for iOS (6 and above), Android (4.0 and up) and Windows Phone. You can also use Telegram's web version or install one of our desktop apps for Windows, OSX, and Linux.
>
> You can log in to Telegram from as many of your devices as you like — all at the same time. Just use your main mobile phone number to log in everywhere.

86.    Using Defendant's Telegram software, these devices operate over cellular connections (e.g., 3G, 4G, and LTE) or Wi-Fi connections to provide "cross-platform" communication among Telegram users.

87.    Telegram provides various notifications to users regarding posts, responses, and acknowledgments.

88.    Telegram users receive text and graph notifications from their browser or app (i.e., a network client) to alert them of any relevant posts, messages, calls, and other content.  Telegram also provides real-time presence notifications and the read status for group and individual messages.

89.    Telegram realizes substantial value from the group messaging feature of the Telegram application and platform.

90.    Telegram infringes the GroupChatter Asserted Patents by making, using, monetizing, providing, deploying, and testing the Telegram ecosystem including Telegram infrastructure (e.g., server-based systems), Telegram.org, and the various Telegram apps that users install on phones, tablets, and computers.

These infringing Telegram components and Telegram systems are the "Accused Systems."

## COUNT 1
## INFRINGEMENT OF U.S. PATENT NO. 8,588,207

91.    GroupChatter incorporates paragraphs 1 through 90 herein by reference.

92.    GroupChatter is the owner, by assignment, of U.S. Patent No. 8,588,207 (the "'207 Patent"), titled "METHOD AND APPARATUS FOR EFFICIENT AND DETERMINISTIC GROUP ALERTING."

93.    A true and correct copy of the '207 Patent is attached as Exhibit B.

94.    As the owner of the '207 Patent, GroupChatter holds all substantial rights in and under the '207 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

95.    The United States Patent Office granted the '207 Patent on November 19, 2013.

96.    The '207 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

97.    Defendant practices one or more claims of the '207 Patent, including at least claims 1, 2, 3, 5, 6, 8, 9, 11, and 12, by making, using, monetizing, testing,

offering for sale, selling, and/or importing the Accused Systems for operation as a deterministic group messaging system used by Telegram users to exchange group messages over wireless networks (e.g., cellular, Wi-Fi, WiMAX, wireless broadband).

98.    Telegram has directly infringed and continue to infringe the '207 Patent by deploying, testing, using, providing, monetizing, and operating the Accused Systems to provide acknowledged group messaging to users and perform acknowledged group messaging.

99.    The Accused Systems provide users the ability to start group conversations and exchange messages among members of a group using mobile devices operating on wireless networks.

100.    Telegram usernames are part of a user's profile. Defendant uses this information to help Telegram users find other Telegram users and to organize a user's information within the Telegram infrastructure (e.g., on Telegram servers):

101.    From within the Telegram app, a user selects the "New Group" button to create a group. Once the group members are selected, users may change the group identifier or "Group Name" and include additional members having recipient identifiers.

102.    Group information is stored on Telegram servers.

103.   In the context of the Asserted Claims, a Telegram app may act as network client to transmit to the Telegram infrastructure (e.g., a Telegram server) a request for wireless transmission of a group message.

104.   Telegram transmits group information related to the group address, group membership, and/or recipient identifying information via the Telegram infrastructure to a network client (e.g., Telegram app).

105.   The Accused Systems broadcast group messages to members via wireless networks such as cellular or Wi-Fi networks on which network client devices are operating.

106.   The Accused Systems receive acknowledgments from group members via the user's wireless network (e.g., Wi-Fi network or cellular network).  For example, a message-initiating user will see when her message is delivered and when the recipient user sees it.

107.   Telegram tracks and updates a message's status from one check mark to two check marks when appropriate.  Users may respond to group messages with emoticons, messages, or read indicators sent from their mobile device.

108.   When membership changes in a Telegram group, membership data on the Telegram server system is updated along with affected users' mobile devices.

109.   Defendants' infringing conduct described in this Count has damaged

GroupChatter.  Telegram is liable to GroupChatter in an amount that adequately compensates it for infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT 2
## INFRINGEMENT OF U.S. PATENT NO. 9,014,659

110.  GroupChatter incorporates paragraphs 1 through 109 herein by reference.

111.  GroupChatter is the owner, by assignment, of U.S. Patent No. 9,014,659 (the "'659 Patent"), titled "METHOD AND APPARATUS FOR EFFICIENT AND DETERMINISTIC GROUP ALERTING."

112.  A true and correct copy of the '659 Patent is attached as Exhibit C.

113.  As the owner of the '659 Patent, GroupChatter holds all substantial rights in and under the '659 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

114.  The United States Patent Office granted the '659 Patent on April 21, 2015.

115.  The '659 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

116.   Telegram is practicing one or more claims of the '659 Patent, including at least claims 1, 2, 3, 4, 5, 7, 8, 10, 11, 12, 13, 14, 16, and 17, by making, using, offering for sale, monetizing, selling, and/or importing the Accused Systems that provide a deterministic group messaging system to Telegram users who exchange group messages over wireless networks (e.g., cellular, Wi-Fi, WiMAX, or wireless broadband).

117.   Telegram has directly infringed and continues to infringe the '659 Patent by deploying, testing, using, monetizing, and operating the Accused Systems to provide acknowledged group messaging to users and perform acknowledged group messaging.

118.   The Accused Systems operate on computers, desktop computers, laptops, smartphones, tablets, and mobile devices and communicate using cellular and/or Wi-Fi networks.  Such hardware having the Telegram apps installed are included in the definition of "Accused Systems."

119.   Accused Systems provide Telegram users the ability to start group conversations and exchange messages among members of a group via mobile devices operating on wireless networks.

120.   Telegram stores on its servers data relating to recipients, groups created by users, and group membership information.

121.   Telegram usernames are part of a user's profile.  Defendant uses this information to help Telegram users find other Telegram users and to organize a user's information internally on the Telegram servers.

122.   Telegram provides to mobile devices running Telegram app(s) group information such as group membership and recipient identifying data stored on the Telegram server infrastructure.

123.   A user selects the "New Group" button to create a group having a group identifier or "Group Name" and include members having recipient identifiers.

124.   Telegram transmits Group messages wirelessly to mobile devices corresponding to each recipient in the selected group.

125.   Mobile devices running a Telegram app or accessing the Telegram System via a web browser receive a group message and respond with acknowledgment of receipt, an alphanumeric text reply, and/or indication the group message has been received but not read by the user.

126.   Telegram stores acknowledgment data for each group member in memory.

127.   The Telegram "Typing" Status option lets a user's Telegram contacts know when the user is Telegram.

128.    The Telegram "Last Seen" Status displays when other users have seen the user's messages and will display the "Last Seen" status to other users when their messages have been seen.

129.    Telegram sends messages to the Accused System's network clients based on stored acknowledgment data.

130.    The Accused Telegram System broadcasts group messages to users via the users' wireless networks (e.g., cellular or Wi-Fi networks).

131.    The Accused Telegram System receives acknowledgment responses from group members via the wireless network used by a user's device.

132.    The Accused Telegram Systems provide acknowledgment responses indicating to the network client who has seen the group message.  For example, a message-initiating user will see when her message is delivered and when the recipient sees it.

133.    Users may respond to group messages in Telegram with stickers, emoticons, messages, or read indicators sent from their mobile device.

134.    When membership changes in a Telegram group, Defendant updates membership data on the Telegram infrastructure (e.g., Telegram servers) and any user's device (e.g., phone or computer) that may be affected by the change.

135.    The  Accused  Telegram  System  provides  acknowledged  group

messaging.

136.   Telegram servers store recipient identifiers for each group member, a group identifier corresponding to recipient groups, and information about membership of recipients in the recipient groups.

137.   Telegram stores group information on user devices having the Telegram application installed.

138.   When a group message is initiated, the Telegram client application within the Accused Systems causes wireless transmission of the group message to mobile devices corresponding to group recipients.   In turn, mobile devices receiving the group message transmit a response.

139.   In operation, the Telegram client application in the Accused Systems monitors group message information relayed by Telegram infrastructure (e.g., servers) for group message responses.   The client application stores acknowledgment data and message status information for each group member.

140.   Telegram instructs and encourages end users of the Telegram Accused Systems to use the Telegram Group Chat features.  Telegram is on notice of the Asserted Patents and the conduct by Telegram and its end users and customers that infringe them.

141.   As a result of Telegram's infringing conduct described in this Count,

GroupChatter has been damaged. Defendants are liable to GroupChatter in an amount that adequately compensates it for Defendant infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT 3
## INFRINGEMENT OF U.S. PATENT NO. 9,294,888

142. GroupChatter incorporates paragraphs 1 through 141 herein by reference.

143. GroupChatter is the owner, by assignment, of U.S. Patent No. 9,294,888 (the "'888 Patent"), titled "METHOD AND APPARATUS FOR EFFICIENT AND DETERMINISTIC GROUP ALERTING."

144. A true and correct copy of the '888 Patent is attached as Exhibit D.

145. As the owner of the '888 Patent, GroupChatter holds all substantial rights in and under the '888 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

146. The United States Patent Office granted the '888 Patent on March 22, 2016.

147. The '888 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

148.   Defendant are practicing one or more claims of the '888 Patent, including at least claims 1, 2, 3, 4, 5, 10, 11, 12, 13, and 14, by making, testing, importing, deploying, using, and/or monetizing the Telegram Accused System and subsystems that provide a deterministic group messaging system through which Telegram users exchange group messages over wireless networks (e.g., cellular, Wi-Fi, WiMAX, and wireless broadband).

149.   Telegram has directly infringed and continues to infringe the '888 Patent by deploying, testing, deploying, importing, monetizing, using, or operating the Accused Systems to provide acknowledged group messaging to users and perform acknowledged group messaging.

150.   Accused System components (e.g., Telegram apps) operate on desktop computers, smartphones, laptops, tablets, and mobile devices that communicate using cellular and/or Wi-Fi networks.

151.   The Accused System provides users the ability to start group conversations and exchange messages among members of a group via mobile devices operating on wireless networks.

152.   Telegram stores on Telegram infrastructure (e.g., servers) data relating to recipients, groups created by users, and group membership information.

153.   Telegram usernames and user numbers are part of a user's profile.

Defendant provides this information to help users find other available Telegram users. Telegram collects and organizes user information internally on the Telegram servers.

154. Telegram provides group information (e.g., group membership and recipient identifying data stored on the Telegram servers) to mobile devices running the Telegram client application within the Accused Systems.

155. A user selects the "New Group" button to create a group having a group identifier or "Group Name" and include members having recipient identifiers.

156. Telegram wirelessly transmits group messages to mobile devices corresponding to each recipient in the selected group.

157. Mobile devices running a Telegram client application receive a group message and respond with an acknowledgment of receipt, an alphanumeric text reply, and/or indication the group message has been received but not read by the user.

158. Telegram stores acknowledgment data (e.g., confirmation of receipt, a read receipt, or indication a reply was sent) in memory.

159. Telegram sends messages to client applications within the Accused Systems based on stored acknowledgment data.

160. The Accused System broadcasts group messages to members via wireless networks (e.g., cellular or Wi-Fi networks) on which network client devices are operating.

161. The Accused Systems receive acknowledgment responses from group members via the wireless network being used by the respective Telegram user's device.

162. For example, a message-initiating user will see when her message is delivered and when the recipient user sees it.

163. Users send personal messages using the Accused Systems.

164. Telegram provides acknowledgment responses indicating to the network client who has seen the group message and who among group members has not.

165. Users may respond to group messages in Telegram with emoticons, messages, or read indicators sent from their mobile device.

166. When membership changes in a Telegram group, the Accused Systems update membership data on the Telegram server systems along with affected users' mobile devices.

167. Telegram provides acknowledged group messaging.

168. Telegram servers store recipient identifiers for each group member, a

group identifier corresponding to recipient groups, and information about membership of recipients in the recipient groups.

169. Telegram stores group information on a user's mobile device(s).

170. When a group message is initiated, a user's client application within the Accused System causes wireless transmission of a group message to mobile devices corresponding to group recipients. Mobile devices receiving the group message transmit a response.

171. In operation, a Telegram client application monitors group message information relayed by Telegram servers for group message responses and stores acknowledgment data comprising an indication that the group message was received, a group message was read, or a reply was sent by the recipient.

172. Telegram encourages its users and customers to use the Group Chat features of Telegram.org and the Telegram apps.

173. Telegram is on notice of GroupChatter's claims on the '888 Patent and the conduct by Telegram and its end users that are accused of infringement.

174. GroupChatter has been damaged as a result of Telegram's infringing conduct. Telegram is liable to GroupChatter in an amount that adequately compensates it for Defendant' infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35

U.S.C. § 284.

## NOTICE

175.   GroupChatter does not currently distribute, sell, offer for sale, or make products embodying the asserted GroupChatter Patents.

176.   GroupChatter instructs its licensees to mark all licensed products sold, distributed, offered for sale, or made under license to the GroupChatter Patents and has undertaken reasonable efforts as required to comply with the notice requirements of 35 U.S.C. § 287.

## NOTICE OF REQUIREMENT OF LITIGATION HOLD

177. Defendants are hereby notified it is legally obligated to locate, preserve, and maintain all records, notes, drawings, documents, data, communications, materials, electronic recordings, audio/video/photographic recordings, and digital files, including edited and unedited or "raw" source material, and other information and tangible things that Defendants know, or reasonably should know, may be relevant to actual or potential claims, counterclaims, defenses, and/or damages by any party or potential party in this lawsuit, whether created or residing in hard copy form or in the form of electronically stored information (hereafter collectively referred to as "Potential Evidence").

178.   As used above, the phrase "electronically stored information" includes without limitation: computer files (and file fragments), e-mail (both sent and received, whether internally or externally), information concerning e-mail (including but not limited to logs of e-mail history and usage, header information, and deleted but recoverable emails), text files (including drafts, revisions, and active or deleted word processing documents), instant messages, audio recordings and files, video footage and files, audio files, photographic footage and files, spreadsheets, databases, calendars, telephone logs, contact manager information, internet usage files, and all other information created, received, or maintained on any and all electronic and/or digital forms, sources and media, including, without limitation, any and all hard disks, removable media, peripheral computer or electronic storage devices, laptop computers, mobile phones, personal data assistant devices, Blackberry devices, iPhones, video cameras and still cameras, and any and all other locations where electronic data is stored.  These sources may also include any personal electronic, digital, and storage devices of any and all of Defendants' agents, resellers, or employees if Defendants' electronically stored information resides there.

179.  Defendants are hereby further notified and forewarned that any alteration, destruction, negligent loss, or unavailability, by act or omission, of any

Potential Evidence may result in damages or a legal presumption by the Court and/or jury that the Potential Evidence is not favorable to Defendants' claims and/or defenses. To avoid such a result, Defendants' preservation duties include, but are not limited to, the requirement that Defendants immediately notify its agents and employees to halt and/or supervise the auto-delete functions of Defendants' electronic systems and refrain from deleting Potential Evidence, either manually or through a policy of periodic deletion.

## JURY DEMAND

GroupChatter hereby demands a trial by jury on all claims, issues, and damages so triable.

## PRAYER FOR RELIEF

GroupChatter prays for the following relief:

    a. That Defendants be summoned to appear and answer;

    b. That the Court enter an order declaring that Defendants have infringed the '888 Patent, the '207 Patent, and the '659 Patent;

    c. That the Court grant GroupChatter judgment against Defendants for all actual, consequential, special, punitive, increased, and/or statutory damages, including, if necessary, an accounting of all damages; pre and post-judgment interest as allowed by law; and

reasonable attorney's fees, costs, and expenses incurred in this action;

d.  That Defendants be found jointly and severally liable for all damages owed to GroupChatter; and

e.  That Defendants infringement has been willful; and

f.  That GroupChatter be granted such other and further relief as the Court may deem just and proper under the circumstances.

Respectfully submitted, this 31st day of March, 2017.

By:  /s/ *Daniel A. Kent*
Daniel A. Kent
Georgia Bar Number 415110
dankent@kentrisley.com
Kent & Risley LLC
5755 N Point Pkwy Ste 57
Alpharetta, GA 30022
Tel:  (404) 585-4214
Fax:  (404) 829-2412

Cabrach J. Connor (pro hac vice)
cconnor@taylordunham.com
Jennifer Tatum Lee (pro hac vice)
jtatum@taylordunham.com
**TAYLOR DUNHAM AND RODRIGUEZ LLP**
301 Congress Ave., Suite 1050
Austin, Texas 78701
512.473.2257 Telephone
512.478.4409 Facsimile

**ATTORNEYS FOR PLAINTIFF**